*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DU,

      Plaintiff-Appellee,

v

CU,

      Defendant-Appellant.

UNPUBLISHED
April 13, 2023

No. 359622
Livingston Circuit Court Family
      Division
LC No. 21-056628-PP

Before: GADOLA, P.J., and GARRETT and FEENEY, JJ.

FEENEY, J. *(dissenting)*.

Because I believe that the trial court's order did not constitute an abuse of discretion, I respectfully dissent.

"The granting of injunctive relief [in the form of a PPO] is within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion." *Pickering v Pickering*, 253 Mich App 694, 700; 659 NW2d 649 (2002) (citations omitted). "An abuse of discretion is found only if an unprejudiced person, considering the facts on which the trial court acted, would say there is no justification or excuse for the ruling made." *Id.*, citing *Ellsworth v Hotel Corp of America*, 236 Mich App 186, 188; 600 NW2d 129 (1999).

Pursuant to MCL 600.2950(4), a trial court is required to issue a PPO if it finds "reasonable cause to believe that the individual to be restrained or enjoined may commit 1 or more of the acts listed in subsection (1)" of MCL 600.2950. As this Court stated in *Pickering, supra* at 701,

> The acts listed in subsection 1 include "[a]ny other specific act or conduct
> that imposes upon or interferes with personal liberty or that causes a
> reasonable apprehension of violence." MCL 600.2950(1)(j). In
> determining whether good cause exists [to issue the PPO], the trial court
> is required to consider "[t]estimony, documents, or other evidence" and

"[w]hether the individual to be restrained . . . has previously committed or threatened to commit 1 or more of the acts listed in subsection (1)." MCL 600.2950(4)(a) and (b).

Subsection 1 also includes "[t]hreatening to kill or physically injure a named individual." MCL 600.2950(1)(c).

Notably, MCL 600.2950(1) does not limit consideration of the facts stated in the PPO application—facts that must be stated with "particularity," per MCR 3.703(B)(2)—to events that happened contemporaneously with or close in time to the PPO application. MCR 3.703(G) does specify, however, that when requesting an ex parte order, the petition "must set forth specific facts showing that immediate and irreparable injury, loss or damage will result to the petitioner from the delay required to effect notice or from the risk that notice will itself precipitate adverse action before an order can be issued." There is no limitation in either the statute or court rules that permits the court to disregard the written allegations in the application.

In the instant case, petitioner's PPO application referenced more than the Thanksgiving incident where respondent threatened to "blow his brains out" and had access to a loaded gun in his van which put petitioner "in fear of my life" and "prevented me from walking outside." Petitioner also stated "I was fearful of him shooting me and taking my life which was why I called the police." She also referenced a May 2019 incident involving an argument in the bedroom where respondent "picked up a large vase made of heavy glass. He went to throw it at my head and it ended up falling out of the way. But he was aiming at my face." The petition also referenced a June 3, 2017 argument that escalated with respondent ripping the handrail off the steps to the upstairs: he threw the railing towards petitioner and her daughter damaging a large painting in the dining room. Petitioner's PPO affidavit asserted that she had a video of this event as "proof of his violent outbursts;" "[i]t terrifies me that I could be seriously injured and killed during one of his outbursts." Petitioner also stated that respondent punched holes in the walls at the home multiple times. Finally, the petitioner described an argument while respondent was driving and he got mad so he started "slamming on the breaks to cause me to hit my face into the dash so many times, that I took my seat belt off and dove to the back seat" and laid down to avoid being injured.

Clearly, petitioner gave several examples of behavior that would lead a reasonable person to believe that the respondent may commit one or more of the acts listed in MCL 600.2950(1). While petitioner's counsel attempted to elicit testimony regarding all these events, the trial court refused to consider anything other than the Thanksgiving 2021 event because, in its view, the allegations "have to be fairly close in time" to the PPO application date. No such limitations exist in the statute or court rules. While the trial court incorrectly limited its consideration to only some of the facts underlying petitioner's PPO application,[1] I believe that the trial court still made the

---

[1] The trial court arguably discussed the other allegations but gave them no weight. The trial court made several statements expressing incredulity over why petitioner would include a 2017 allegation in her application when she married respondent in 2018: "[I]f you're scared for your life, you don't usually end up marrying people." Other statements reflect the court's apparently

proper decision to uphold the PPO after examining the entirety of the evidence presented during the 99-minute hearing.

The trial court elicited testimony that respondent would get emotional during the parties' arguments—emotional enough to say he would hurt himself or someone else. Respondent admitted that he had outbursts in the past and had a gun in his van. Respondent did not remember punching holes in the walls and admitted that his outbursts would cause a reasonable person to feel like they might become injured if he was physical towards them. Respondent testified that he did not threaten to shoot himself in the head but instead said "[i]f I drive, I could kill myself" because he was so upset at Thanksgiving. Respondent denied throwing things at petitioner but admitted he kicked the gate in a "tantrum" and threw it away from, not at, petitioner.[2] He also admitted to having outbursts but was not proud of those outbursts, and the Court considered these admissions. These are the respondent's statements that the trial court apparently found to be credible. Petitioner testified that respondent got emotional enough during their arguments to say he would hurt himself or someone else. The court agreed and found that it "understand[s] where the Petitioner would be afraid that he might hurt her, especially if he's having uncontrolled outbursts."

The court found that "I do believe he threatened to hurt himself," a critical determination of credibility[3] and found as supporting evidence petitioner's call for police assistance. The court also recognized the coercive and manipulative impact of a statement like "I'll kill myself;" the court correctly observed that people in a relationship who "threaten to take their lives [will] try to make the other person concerned enough so that they have a relationship again or make up. That's my concern." Respondent admitted to having outbursts and he carries a gun, which also concerned the trial court.[4] "But again, it's been kind of—it's kind of a PPO by innuendo in that he says he's

_____

generic skepticism regarding petitioner's fear of harm: "[p]eople have arguments all the time;" "[e]veryone who asks for a PPO says they're afraid for their lives;" "I'm sure there have been [incidents]. There have been in every marriage…I mean, it's questionable if there were incidents, why didn't she get a PPO earlier?….Petitioner has the burden of proving that he actually said these things." The trial court chastised petitioner's counsel for "going back" to the other allegations in the petition: "I have—we have heard about the 2017 case, even though it was a long time ago. What I wanted to focus on was the lethal threat which would be a primary, serious, point of this PPO. And the other things, throwing a vase, throwing a railing, is not exactly something that a reasonable person would be scared for their life. That's why we didn't concentrate on that."

[2] After denying all the allegations in petitioner's PPO application, when asked, "So what you're saying is over the years, she just made up all these incidents of violence of you towards her" respondent testified "[s]he's altered the situation."

[3] The majority states that the "only support for this allegation is Petitioner's uncorroborated testimony that he made this statement." *Ante*, at 3. A domestic violence victim's testimony can be believed as credible even if uncorroborated.

[4] Respondent's counsel argued that petitioner was using the PPO as "leverage in the divorce. Even if she was scared, there was no reasonable basis for her to be scared. She alleges that he threatened to commit suicide, and that's the best she can come up with." The court responded by observing

going to blow up his brains, I'm [sic] afraid for my life. I can understand why she would be afraid if he said that to her."

Notably, petitioner's attorney properly argued that the history of violence and respondent's admission to having a violent temper justified issuance of the PPO, but the trial court, without permitting counsel to elicit evidence on the other allegations, said it had seen and heard more graphic and tragic allegations than what petitioner alleged and "would not issue a PPO on the other parts that she brought up." The trial court recognized, however, that it had to be very careful due to his threats to kill himself. "If you did [apply for a PPO] because you were sincerely afraid for yourself, then that would be a reason to get a PPO…. I believe him when he said I've had outbursts before. He makes it very credible." The court also took note that respondent did not point the gun at petitioner. Then the trial court made the following findings:

> So I am going to continue the order on the PPO. Again, this could have gone either way. It's very difficult, but in this time in our world, people are doing very serious things that would scare a lot of people. And these people are going through a divorce. I don't want anything to happen to either one of them.
>
> Mr. U[], if you feel so shaky that you can't drive, that is a concern to me. Because you couldn't leave the residence, you were so upset, you were so emotional, and in that emotional state, I do believe you could have made the statement well, I'll just blow my brains out. Because people do say that. *They threaten suicide when they don't get their way in a relationship.* I think, in order to make the Petitioner feel safe during this divorce, I am going to sign an order. I'm continuing the PPO, as I said. [Emphasis added.]

The court then made some dicta-like comments about wishing respondent could receive a psychological evaluation to make "everyone feel more safe.[5] I'm just erring on the side of safety at this time."

---

that "I think that's very coercive. I think that is very manipulating to her. Because if she cares about him, and he says I'm going to blow out my brains, she's obviously—it's going to make her fearful that he might do that."

[5] The majority references more than once that petitioner did not remember if she used marijuana on the day in question. She did testify that she used on occasion because she was nervous when respondent was home, that she more than likely used in the early morning, and that she did not use enough to change her personality or make her more emotional. *See ante*, slip op at 4 n 3. Specifically, the majority contrasts the clarity with which petitioner recalls the events of the day with her lack of memory as to whether she smoked marijuana that day. This point is arguably irrelevant regarding petitioner's credibility in relating the events of that day. But at the risk of being drawn into assessing petitioner's credibility, which, as the majority correctly points out, is the province of the trial court, I offer the following observations.

When these last comments are read outside the context of the entire hearing, it appears that the trial court is basing its decision on a desire to mollify petitioner. When read as a passing attempt to provide petitioner with some assurances in the light of all testimony, the "erring on the side of safety" comment neither diminishes nor eliminates the court's findings that respondent's actions created a reasonable apprehension of violence. And respondent's statement that he would "blow his brains out" qualified as a threat "to kill or injure…a named individual" per MCL 600.2950(1). The totality of the circumstances reveals no abuse of discretion here because an unprejudiced person, considering the facts on which the trial court acted, would say there was justification for the ruling made. *Pickering,* 253 Mich App at 700. Accordingly, I would uphold the trial court's order denying respondent's motion to terminate the PPO.

/s/ Kathleen A. Feeney

When asked by the trial court whether she had smoked marijuana that day, petitioner responded the she did on occasion but that she "couldn't say for a fact if I did or not that day. But I have on occasion. I do get nervous when he's at home. So it'll [sic] more than likely that I did in early morning." Then, in response to a follow-up question regarding whether she had smoked marijuana that morning, she responded, "I'm not 100 percent sure, so I don't want to say yes or no." When pressed a third time about whether she remembered smoking marijuana that day, she replied, "I just don't want to say yes or no because I—I don't definitively remember." She also stated that she would not have smoked enough to make her more upset than normal or enough to change her personality. Petitioner's testimony suggests that it was common for her to smoke marijuana when respondent was present in the home. That is to say, that it was routine. Nothing in the record reflects that the trial court found petitioner incredible as a result of either this exchange or her likely use of marijuana on the day in question.